UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


CMP, LLC                                          CIVIL ACTION


V.                                                NO. 16-6850


RAILWAY SPINE PRODUCTIONS, LLC, ET AL.            SECTION F


ORDER AND REASONS

Before the Court are the parties' cross motions for summary judgment on three issues.  The plaintiff, CMP, claims that it is owed "Overage Fees," "Site Representative Fees," and reasonable attorney's fees and expenses pursuant to a contract entered into by the parties.  The defendants, Railway Spine Productions, LLC ("RSP"), Seven Curses Productions, LLC ("SCP"), Abel Meet Cain Productions, LLC ("AMCP"), and Home Box Office, Inc. ("HBO"), seek summary judgment in their favor on the same issues.  For the reasons that follow, the plaintiff's motion is DENIED.  The defendants' motion is GRANTED in part and DENIED in part.

**Background**

This litigation arises out of a production company's use of private property to film scenes for a television series.

1

CMP owns rural property in the Town of Jean Lafitte, located in Jefferson Parish, Louisiana.  RSP, a television production company, entered into a Location Agreement with CMP to use its property from June to July 2015 to film scenes for a television series entitled *Quarry*.  According to the Location Agreement dated May 12, 2015, the filming would occur from June 9, 2015 to July 28, 2015.  This time period consisted of set preparation, shooting, and wrap periods.  During set preparation, from June 9, 2015 to July 6, 2015, RSP was to prepare the "Vietnam Village," "Marine Barracks," and "Heroin Dock" sets.  RSP would then shoot the scenes on July 7, 8, 9, and 13, 2015.  The wrap period, during which property and personnel would be removed from CMP's property, was slated to last from July 14, 2015 to July 28, 2015.  The Agreement obligated RSP to pay CMP $8,000 for prep, another $8,000 for wrap, and $7,500 for each day of shooting.

The Agreement also provided for CMP to receive additional fees if certain contingencies came to pass.  According to the Agreement, RSP would owe CMP $1,500 a day in "Overage" for "each day property is occupied beyond the term."  In no other section of the Agreement or its addendum was this "Overage Fee" provision further clarified, or even referenced.  The Agreement also bound CMP to pay $100 per day for each day CMP's "site representative" assisted in opening and closing the property.  This representative, per the Agreement, functioned as a "liaison between [CMP] and [RSP]

2

and its designees." Thomas A. "Tac" Carrere, the sole officer of CMP and owner of the Jean Lafitte property, admits that he requested the language of these provisions be included in the Location Agreement.

Paragraph 2 of the Location Agreement empowered RSP to, "after acquiring any necessary permits, bring any personnel, equipment, props and temporary sets onto the Property" it deemed necessary or beneficial to the filming. However, Paragraph 2 also provided that RSP "shall **completely** remove" all such property upon the project's culmination (emphasis in Agreement). All sets, props, and equipment, the Agreement further stipulated, were to remain RSP's property "unless otherwise agreed to in writing."

Aside from its duty to completely remove anything it brought onto CMP's property by the expiration of the term, RSP further agreed to "provide all clean up" and "return the Property as received (reasonable wear and tear and hidden and latent defects excepted)" pursuant to Paragraph 7 of the Agreement. That paragraph additionally obligated RSP to supply any repair costs in an amount mutually agreed upon by RSP and CMP.

An addendum to the Agreement later permitted RSP to clear and burn brush, weeds and trees on the property as part of its creation of a "Vietnam Village" set, provided RSP remove its set pieces and any resultant burnt debris by the end of the term. RSP also agreed

3

to lay down up to three loads of gravel on the property's existing roads to counteract any wear and tear its activity would inflict.

To complete preparation and construction tasks for the shoot, RSP enlisted Barrier Resources LLC, a construction company wholly owned by Carrere.  In early July, just days before filming began, Barrier Resources deposited river sand on a small tract of the property which heavy rains had rendered impassable.

On or around July 20, 2015, in accordance with its contractual obligations, RSP had removed most its personnel and equipment. However, RSP had left behind refuse, construction materials, equipment, and portions of temporary sets and props, as well as river sand.  RSP additionally left intact on the property a small hut erected for the shooting, allegedly at the behest of Carrere for his children.  Carrere admits suggesting that RSP leave the hut, but he nevertheless suggests that it remains RSP's property, since the parties never agreed to transfer ownership of the hut in writing.  According to CMP, the hut, the river sand and remnants from RSP's sets remain on the property.

CMP submitted to RSP its contractor's invoice in the amount of $32,145.74 for remaining clean up and damage repair.  Mickey Lambert, on behalf of RSP, agreed with the scope of the work contemplated by the invoice, but not the price; he countered with changes amounting to a total of $19,214.50.  On July 31, 2015, CMP

4

submitted its contractor's revised invoice for clean up in the amount of $19,400.

The parties mutually agreed on that amount for cleanup. Lambert, however, told CMP that CMP must first execute a release before RSP paid the $19,400. CMP fretted that the release might shield RSP from mitigating any penalties imposed by regulatory authorities for the failure to acquire the necessary regulatory permits before the deposit of river sand onto CMP's property in early July. As a result, CMP refused to sign the release.[1] The parties reached an impasse.

On April 22, 2016, CMP sued RSP, SCP, AMCP, and HBO in state court for breach of contract, defamation, and trespass. In its petition, CMP listed five breaches of the Agreement: (1) a failure to obtain necessary permits prior to occupying CMP's property, in particular, before depositing river sand on CMP's wetlands; (2) a failure to completely remove RSP's property from the site and failure to restore CMP's property to its pre-work condition; (3) a failure to pay the Site Representative Fee ($100/day) since June 18, 2015; (4) a failure to pay the Overage Fee ($1,500/day) from

---

[1] CMP hired a lawyer to draft a release that did not waive the indemnity provisions in the Agreement. The release was forwarded to the defendants on August 15, 2015 and included a provision that HBO shall be the guarantor of the indemnity provision in the Agreement. Defendants countered with yet another release that was unacceptable to CMP.

July 29, 2015 due to RSP's continuing occupation of the property; and (5) an attempt to impose unauthorized and overreaching conditions on CMP in return for their obligation to pay for the cleanup of CMP's property.  CMP also sought to recover a portion of the income generated by *Quarry*. On May 23, 2016, the defendants removed the case to this Court, invoking the Court's diversity jurisdiction.[2]  The defendants moved to dismiss CMP's defamation claim and its claim to recover income from *Quarry*.  In its October 6, 2016 Order and Reasons, this Court granted the motion, dismissing the plaintiff's defamation claim and claim seeking a percentage of income derived from the production of *Quarry*.  In early November, the parties agreed to settle CMP's claim for a breach of the obligation to clean and restore its property. The settled claim entails only RSP's alleged duty of

> removing debris and partial sets and props left behind on CMP's Property, removal of dead and burned trees on CMP's Property caused by RSP's activities thereon, levelling grading and applying limestone to roads on CMP's Property damaged by RSP's equipment, and repairing a levee damaged by RSP's equipment on CMP's Property.

---

[2] The defendants later filed a third-party complaint against Carrere individually and Barrier Resources for indemnification and contribution for any liability arising out of the failure to procure permits for the depositing of the river sand on the property.

CMP now seeks partial summary judgment.  CMP claims that it has established, as a matter of law, that: (1) pursuant to the Location Agreement RSP is liable for $1,500 a day in "Overage Fees" for every day since July 28, 2015 during which RSP has failed to "completely remove" its property from CMP's property and to complete its repair and refurbishment obligations; (2) pursuant to the Agreement, RSP owes CMP $100 a day in "Site Representative Fees" for every day between June 18, 2015 and July 28, 2015; and (3) RSP is liable for reasonable attorney's fees and expenses incurred by CMP in the enforcement of RSP's obligation to pay the aforementioned Overage and Site Representative Fees under the Location Agreement.  The defendants, in their cross motion, assert that the record supports dismissal of all three claims.

I.

A.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law.  No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See id. Ultimately, "[i]f the evidence is merely colorable . . . or is not significantly probative," summary judgment is appropriate. Id. at 249 (citations omitted); see also Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007) (internal quotation marks and citation omitted) ("[T]he nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence."); King v. Dogan, 31 F.3d 344, 346 (5th Cir. 1994) ("Unauthenticated documents are improper as summary judgment evidence.").

In deciding whether a fact issue exists, courts must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007) (citations omitted). Although the Court must "resolve factual controversies in favor of the nonmoving party," it must do so "only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Antoine v. First Student, Inc., 713 F.3d 824, 830 (5th Cir. 2013)(internal quotation marks and citation omitted).

*B.*

Because this Court has invoked diversity jurisdiction, the substantive issues of this case are governed by Louisiana law. Travelers Cas. & Sur. Co. of Am. v. Wright Ins. Agency Inc., 404 F.3d 927, 928 (5th Cir. 2005). Interpreting a contract in accordance with Louisiana law requires a court to attempt to determine the common intent of the parties. LA. CIV. CODE art. 2045. Pursuant to Louisiana Civil Code Article 2046, "when the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LA. CIV. CODE art. 2046; see In re Liljeberg Enters., Inc., 304 F.3d 410, 440 (5th Cir. 2002). Courts must grant the words of a contract their "generally prevailing meaning" in ascertaining their effects. LA. CIV. CODE art. 2047. Each contractual provision should be interpreted in the context of the contract's other provisions and its suggested meaning as a whole. LA. CIV. CODE art. 2050; see Greenwood 950, L.L.C. v. Chesapeake Louisiana, L.P., 683 F.3d 666, 669 (5th Cir. 2012).

A court may grant summary judgment if a contract or contractual provision at issue is susceptible to unambiguous interpretation within its four corners. See Greenwood 950, 683 F.3d at 668. If, however, two or more reasonable interpretations of the words of a contract exist, the ambiguity is strictly

construed against the drafter. LA. CIV. CODE art. 2056; see Liljeberg, 304 F.3d at 440; Sims v. Mulhearn Funeral Home, Inc., 956 So. 2d 583, 590 (La. 2007). Mindful of these commonsense principles, the Court turns to consider whether either side is entitled to judgment as a matter of law concerning plaintiff's contractual entitlement to overage fees, site representative fees, or attorney's fees and expenses.

II.

*A.*

In papers rife with meandering and opaque reasoning, the plaintiff essentially argues that the Overage Fee provision in the Location Agreement was intended to function as a stipulated damages clause. CMP asserts that RSP's promise to pay CMP $1,500 a day for each day the property is "occupied" beyond the term constituted a promise to pay $1,500 for each day RSP 1) failed to "completely remove" its property from the Jean Lafitte property in accordance with Paragraph 2 of the Location Agreement and 2) failed to repair and refurbish CMP's property pursuant to Paragraph 7.

CMP has attached to its motion several photographs—some timestamped July 30, 2015, others on September 29, 2015—which purport to show the small hut left intact after the shooting, remnants of sets and props, river sand, and two porta potties. These exhibits, CMP insists, prove as a matter of law that the

10

defendants have continuously "occupied" CMP's property well past the Agreement's expiration.[3]  The defendants complain that the photographs are unauthenticated and thus cannot constitute competent summary judgment evidence.  However, the Court need not reach the evidentiary issues posed by the plaintiff's photo gallery.  Even if the photographs pass evidentiary muster and the photographed items remain on the set to this day, the defendants are not obligated to pay CMP any overage.  CMP's argument belies both sound principles of language construction and common sense.

The word "occupied" appears once in the Location Agreement, in the portion of the "Additional Fee[s]" paragraph stipulating that RSP owes CMP $1,500 a day "for each day property is occupied beyond the Term."[4]  It is not defined or clarified in any other section of the Agreement. Therefore, in ascertaining the parties' common intent in including "occupied" in the Overage Fee provision, the Court must turn to the word's generally prevailing meaning and evaluate it in the context of the Agreement's other provisions.

---

[3] CMP persists in this claim despite the "clean up" claims resolved by the November 2016 settlement agreement.

[4] The Additional Fees provision states:
> Producer will pay to Owner $1,500.00 per day, (the "Overage") for each day property is occupied beyond the Term. Overage to be paid each Friday occurring after Term. Producer agrees to pay Owner's site representative $100.0 [sic] (one hundred dollars) per day to open and close the property. Site representative to be designated by Owner and to act as liaison between Owner and Producer and its designees.

The Location Agreement is most akin to a lease: while retaining ownership of the Jean Lafitte property, CMP permitted RSP and the defendants to bring equipment and personnel onto the land for a fixed period of time to film *Quarry*.  Under Louisiana law, the term "occupy" typically denotes physical presence and activity on another's property in the context of a lease agreement. See, e.g., Pioneer Exploration, L.L.C. v. Steadfast Ins. Co., 767 F.3d 503, 506, 513 (5th Cir. 2014) (holding that a company with a mineral rights lease "occupied" the surface land because the land was under its "care, custody and control"); LeBlanc v. Romero, 783 So. 2d 419, 421 (La. App. 3 Cir. 2/28/01) (finding that the phrase "permanently occupy" in an act of sale for a tract of land meant to "permanently reside thereon").  Webster's Third New International Dictionary features 12 definitions for the word "occupy." Occupy, Webster's Third New International Dictionary, Unabridged (1961). Of those, only two could plausibly apply to the word's role in a contract granting a television producer the right to film and produce a series on a tract of land: "to hold possession of" or "to reside in as an owner or tenant." Id. Similarly, Black's Law Dictionary defines "occupy" (*inter alia*) as "to take up the extent, space, room, or time of," "to hold possession of; to be in actual possession of," and "to live or stay in (a place)." Occupy, Black's Law Dictionary (10th ed. 2014).

Given these definitions and the prevailing nature of the word's use in lease-type agreements, it is evident that the word "occupy" in the Overage Fee provision refers to RSP's right under Paragraph 1 of the Agreement to "enter and remain on the Property to complete all scenes and work and to photograph, film, tape, record and reproduce the Property and scenes thereon[.]"  The provision simply guaranteed CMP daily overage for each additional day RSP and the defendants failed to finish what they came to do: use the land to film a television series.[5]  To suggest that both parties instead understood that the presence of a single hut, wooden platforms and river sand would constitute "occupying" the property is to defy the word's clear meaning within the four corners of the Agreement.

In support of its position, CMP invokes the Louisiana Supreme Court's decision in Lama v. Manale, 50 So. 2d 15 (La. 1950).  A provision in a lease agreement obligated the tenant defendants to pay five times the daily rent for each day after the lease term's expiration that they failed to "surrender possession" of the premises.  Id. at 16.  The provision explicitly defined surrender

_____

[5] The Court emphasizes that this is the only reasonable interpretation of the meaning of "occupy." Assuming *arguendo* that the word's meaning were ambiguous in this context, the Court would still construe its meaning against CMP, since Carrere has admitted that he introduced the Additional Fees language into the Location Agreement.  LA. CIV. CODE art. 2056; see Liljeberg, 304 F.3d at 440; Sims, 956 So. 2d at 590.

as the "actual delivery of all keys at Lessor's place of business, the premises to be left broom clean and trash removed." Id. The Supreme Court held that the provision bound the tenants. Id. at 517-18.

However, this case is inapposite for two reasons. First, unlike the defendants in this case, the tenants in Lama physically remained on premises and refused to leave; the case was not decided on the basis of the defendants' failure to leave the premises "broom clean."  See Lama v. Manale, 34 So.2d 55, 56 (La. 1948). Second, the contract in Lama included a specific reference to the obligation to clean the apartment in the liquidated damages provision missing from the Overage Fee provision in the Location Agreement.  See Lama, 50 So. 2d at 16.  Absent any definition in the lease agreement to the contrary, it would be patently absurd for a landlord to claim that an outgoing tenant was "occupying" the apartment past the lease's term merely because she left a lamp and a few pots and pans behind after otherwise moving out.

The Louisiana Third Circuit's decision in Klumpp v. Colonial Pipeline Co., invoked by the defendants, provides more helpful reasoning in similar circumstances. 389 So. 2d 457 (La. Ct. App. 3 Cir. 1980). In Klumpp, a landowner granted a 50-foot right-of-way servitude to an oil company for a pipeline.  Id. at 464.  The servitude agreement stipulated that Colonial would pay $200 a day

14

in damages for each day it "remain[ed]" on the plaintiff landowner's property in excess of 60 days. Id. at 465. A separate provision entitled the plaintiff to $15 an acre (but no more than $2,400 total) for the cost to "restore the land and levees to their former condition." Id. After the pipeline company vacated the premises without completing the clean-up process, the trial court awarded the plaintiff $200 a day in stipulated damages, retroactive to the day the plaintiff sent written notice demanding completion of the project. Id. at 466-67. On appeal, the Third Circuit reversed. Id. at 467-70. The oil company successfully argued that the $200 a day stipulated damages provision was triggered only by a breach of its primary obligation: to complete its pipeline work within 60 days. See id. at 467-69. That the company breached its separate obligation to "restore" the land after completion of its work therefore did not subject it to the draconian $200 a day penalty. See id. at 468-70.

CMP attempts to distinguish Klumpp by emphasizing that while that servitude agreement included two stipulated damages clauses—one for "remaining" on the property past 60 days and another for failing to restore the land—the Location Agreement contains only the single Overage Fee provision. See id. at 465. The Overage Fee clause, per CMP's logic, applies to the defendants' obligation "not only to clean up and restore Plaintiff's Property to pre-project conditions, but also to completely remove their property

15

from the Plaintiff's property." CMP's view of Klumpp, however, misses the forest for the trees. The Klumpp decision underscores the function of a stipulated damages clause in Louisiana law: to impose a "secondary obligation for the purpose of enforcing the principal" obligation articulated in the provision. See LA. CIV. CODE art. 2005. Just as the $200 a day provision explicitly referred to the oil company's primary obligation to complete its pipeline work within 60 days, the Overage fee provision explicitly refers to the defendants' primary obligation of ceasing to "occupy" the Jean Lafitte property to film *Quarry*. See Klumpp, 389 So. 2d at 468-70. That the Location Agreement contains no other stipulated damage provisions specifically covering the defendants' obligations to "completely remove" their property and "repair and refurbish" the land does not render the Overage Fee provision some all-encompassing penalty clause affording CMP damages for obligations other than that of ceasing occupancy after the term. The negative does not create the positive CMP wants.

CMP additionally attempts to contort the defendants' post-term conduct into an ongoing trespass and the Overage Fee provision as a stipulated damage clause triggered by that trespass. This argument is without merit. Under Louisiana law, a trespass occurs "when there is an unlawful physical invasion of the property or possession of another." Bourquard v. L.O. Ausauma Enters., Inc., 52 So.3d 248, 251 (La. App. 4 Cir. 11/17/10) (quoting Richard v.

Richard, 24 So. 3d 292, 296 (La. App. 3 Cir. 11/04/09)). Although CMP provides jurisprudence which purportedly supports its trespass theory, the cases it cites feature 1). physical invasions far more substantial than the defendants' post-Agreement "intrusion" or 2). conditions to which the property owners, unlike CMP, never consented. See, e.g, Angus Chem. Co. v. Glendora Plantation, Inc., No. 12-1656, 2015 WL 4489344, at *4 (W.D. La. July 23, 2015) (declining to reach the plaintiff's arguments that the defendant's abandonment of a pipeline past a lease's expiration constituted a bad faith trespass); Corbello v. Iowa Prod., 850 So. 2d 686, 708-09 (La. 2003), superseded by statute (finding an oil company liable for contractual damages for actual operation of an oil well on the plaintiff's land past the lease term's expiration); Estate of Patout v. City of New Iberia, 813 So.2d 1248, 1252-53 (La. App. 3 Cir. 4/3/02) (involving defendant that never had permission to deposit garbage on plaintiff's land); Gaspard v. St. Martin Par. Sewerage Dist. No. 1, 569 So. 2d 1083, 1084 (La. Ct. App. 3d Cir. 1990) (holding that the placing of a sewerage line on plaintiff's land without permission subjected the defendant to trespass liability); Vial v. S. Cent. Bell Tel. Co., 423 So.2d 1233, 1235 (La. Ct. App. 5th Cir. 1982) (telephone company committed trespass by constructing sinkholes on plaintiff's land without permission); but cf. Lakes of Gum Cove Hunting & Fishing v. Weeks Marine, Inc., 145 Fed. Appx. 949, 952-53 (5th Cir. 2005) (dismissing trespass

claim when plaintiff noticed dredging material being deposited onto its property but did not object until bringing suit).

Contrary to CMP's assertions, then, refusal to award overage fees for the defendants' failure to remove the hut or wooden platforms or clean up the river sand[6] render the Additional Fees provision "mere surplusage." Rather, the Overage Fee clause clearly and explicitly covers the defendants' obligation not to "occupy"—or be physically present on for the purpose of filming a television series—the Jean Lafitte property. Accordingly, the Court must reject CMP's attempt to siphon hundreds of thousands of dollars off the defendants for "occupying" a property they have not used for filming in more than 18 months.[7]

*B.*

An additional clarification is appropriate before leaving this issue. Mickey Lambert and Virginia McCollam, representatives of RSP, have submitted sworn statements claiming that the

---

[6] Both parties devote reams of precious argument space to squabbling over who first suggested to whom that the river sand be hauled in—an issue important to other pending issues in this lawsuit but wholly immaterial to the question of whether the defendants' conduct constitutes occupancy.

[7] It is worth noting that Louisiana Civil Code Article 2015 empowers a court to employ its discretion to lower a stipulated damages award in the interest of public policy. Even if the Overage Fee provision applied to the defendants' conduct, CMP can rest assured that the Court would have invoked its discretion to prevent it from recovering a king's ransom for leaving items it could have easily and frugally removed itself on its own property.

defendants physically vacated the premises and wrapped up filming
by the July 28, 2015 expiration of the Location Agreement's term.
CMP has furnished no competent summary judgment evidence refuting
that assertion. However, CMP does point to a text message from
McCollam sent in August 2015, which purportedly references an oral
agreement to add $1,500 in overage (one days' worth) and $4,100 in
Site Representative Fees to the $19,400 cleanup invoice.[8]

   In Louisiana, testimonial or other evidence can show the
existence of a valid oral modification to a written agreement. LA.
CIV. CODE art. 1848; Duvio v. Specialty Pools Co., LLC, No. 2015-
CA-0423, 2016 WL 3348855, at *1 (La. App. 4 Cir. 6/16/16);
Schindler Elevator Corp. v. Long Property Holdings, L.L.C., 182
So.3d 233, 240-41 (La. App. 2 Cir. 11/18/15). Because the only
evidence in the record of this purported agreement consists of a
stray text message alluding to a $25,000 payment--$25,000
apparently being the sum of $19,400, $4,100 and $1,500—CMP has not
shown entitlement to judgment as a matter of law that RSP made a
legally enforceable oral promise to CMP.[9] The Court stresses,
however, that the existence of such an oral agreement does not

---

[8] As described in the factual background, the negotiations to have
RSP pay this $19,400 collapsed upon CMP's refusal to release RSP
from any liability stemming from the failure to acquire permits
for the depositing of river sand.
[9] Indeed, it is not clear that CMP seeks judgment as a matter of
law on this more discrete issue, given that the issue of an oral
modification was only raised by way of its reply papers.

disturb a granting of summary judgment on the Overage Fee claim to the defendants.   The oral modification, if proved, would merely obligate RSP to pay the $1,500 in "overage" it allegedly promised; it would not distort the clear meaning of the Overage Fee provision to conform to the plaintiff's desires and entitle the plaintiff to a six-figure overage windfall.   Accordingly, an entry of summary judgment for the defendants on the Overage Fee issue is appropriate.[10]

III.

CMP also claims that it has established beyond a triable issue of fact that the defendants owe 41 days' worth of Site Representative Fees pursuant to the Location Agreement.   The Site Representative Fee provision mandates that CMP receive $100 a day for each day its representative helps "open and close" the property.

The defendants do not deny that they have yet to pay the $4,100 in Site Representative Fees CMP requests. They instead complain about CMP's previous attempt to extract Site

---

[10] Despite deep misgivings about encouraging the prolonging of this litigation, the Court reminds CMP that it remains free to continue seeking enforcement of this purported oral agreement, as well as damages for the defendants' alleged failure to completely remove property, repair and refurbish the property, or acquire necessary permits before depositing river sand.

Representative Fees for each day they sought overage, an attempt CMP did not revive in this motion for partial summary judgment.

In showing that the defendants have failed to pay the $4,100, however, CMP has failed to adequately demonstrate *why* it should receive $100 for each day between June 18 and July 18, 2015. Namely, CMP has not shown that a site representative aided in opening or closing the property for each and every one of the days for which it requests fees.  In emails exchanged between the parties shortly after the term's expiration, RSP expresses a desire to verify that a CMP representative helped open and close the property for each of the 41 days from mid-June to late July. Although CMP insists that the provision was intended to cover every day of the Agreement's term, the Agreement itself only clearly affords the CMP representative $100 a day "to open and close" the property.[11]   Because neither party has supplied evidence demonstrating beyond a genuine issue of material fact that a CMP representative did or did not help "open or close" the property for any or all of the 41 days at issue, the Court cannot grant summary judgment to either party on this issue.

---

[11] Since neither party has seriously addressed this issue, the Court will forego analysis of any ambiguity in the terms "open and close" until the parties provide a factual predicate supporting whether or not a CMP representative was present or assisting RSP on each of the days in the question.

IV.

Finally, CMP seeks reasonable attorney's fees and expenses incurred in its effort to enforce the Overage Fee and Site Representative Fee provisions.  Again, both sides seek summary relief in their favor on this issue.

Paragraph 6 unequivocally entitles CMP to "all reasonable outside attorneys' fees and costs . . . if it must file suit or retain counsel to enforce the terms of this Agreement."  For the reasons articulated above, CMP is not entitled, as a matter of law, to any legal fees expended in the attempt to charge the defendants $1,500 a day in overage.  It may, however, recover reasonable expenses to the extent needed to enforce any right it may have to outstanding Site Representative Fees, should it prevail on that issue at trial.[12]  At this juncture, awarding or denying attorney's fees and legal costs for CMP's effort to collect under the Site Representative Fee provision is premature.  As a result, the defendants' motion for partial summary judgment is granted in part and denied in part.

Accordingly, for the foregoing reasons, IT IS ORDERED: that the plaintiff's partial motion for summary judgment is DENIED. The

---

[12] If CMP succeeds on any of its remaining breach of contract claims, it will also be entitled to reasonable fees and expenses to the extent necessary to enforce those.

22

defendants' cross-motion for partial summary judgment is GRANTED in part (as to the plaintiff's entitlement to the Overage Fees) and DENIED in part (as to the plaintiff's entitlement to Site Representative Fees and legal fees).

New Orleans, Louisiana, February 8 , 2017

MARTIN L.C. FELDMAN
U.S. DISTRICT JUDGE